Luis **PEREZ** and Margarita Perez, Individually and d/b/a Servicios Especializados De Comedores Industriales, Plaintiffs,

v.

**ALCOA FUJIKURA, LTD.**, d/b/a Alcoa Conductor Accessories, Inc., Arneses Y Accessorios De Mexico, and H. Wacaser, Defendants.

Civil Action No. DR–95–CA–32.

United States District Court,
W.D. Texas,
Del Rio Division.

June 13, 1997.

Kevin B. Miller, Law Offices of Kevin B. Miller, San Antonio, TX, for Luis Perez, Margarita Perez.

William J. Stroman, Del Rio, TX, for Alcola Fujikura, Ltd., Arneses Y. Accesorioes de Mexico.

## *ORDER*

BIERY, District Judge.

Before the Court are rather unusual questions which, because of the evolution of the global economy, may arise more frequently in the future. In particular, the Court has for consideration the defendants' motion to dismiss and/or for summary Judgment, and motion for the application of Mexican law. After reviewing the record and the relevant law and finding a close call to be made, the Court concludes the defendants' motion for the application of Mexican law should be denied, and their motion to dismiss and/or for summary judgment under Texas law should be granted except as to count I of the defendants' counterclaims, which will be denied without prejudice to refile as a separate cause of action

### Background and Procedural History

*Plaintiffs' Evidentiary Objections*

■ The Court will first consider the plaintiffs' evidentiary objections to exhibits F, G, H, K, U, and W of the defendants' statement of material facts.[1] FED. R. CIV. P. 56(e) requires that supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Rule 56(e) further requires the party to attach sworn or certified copies of all documents referred to in the affidavit. As a general rule, "[i]n order for a document to be considered in support of or in opposition to a motion for summary judgment, it must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Burnett v. Stagner Hotel Courts, Inc.,* 821 F.Supp. 678, 683 (N.D.Ga.1993), *aff'd,* 42 F.3d

---

1. Insofar as these objections concern evidence which the Court considered in ascertaining the choice-of-law, Rule 44.1 of the Federal Rules of Civil Procedure clearly provides that "[t]he court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."

645 (11th Cir.1994); *see also Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550–51 (9th Cir.1989) (To be considered in a motion for summary judgment, "documents must be authenticated by and attached to an affidavit that meets the requirements of [Rule] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence."); 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2722, at 58–60 (1983). However, uncertified or otherwise inadmissible documents may be considered by the court in ruling on a motion for summary judgment if the documents are not challenged. *See, e.g., Jones v. Owens–Corning Fiberglas Corp. & Amchem Prods., Inc.*, 69 F.3d 712, 718 (4th Cir.1995); *Casas Office Mach., Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668, 682 (1st Cir.1994).

■ Exhibit F is the declaration of Ruben Rubio, who was the accounting manager for Alcoa's Texas and Mexico operations from June 1993 to January 1994. Plaintiffs argue that Rubio's declaration does not contain an averment of personal knowledge because it states the "foregoing is true and correct to best of my knowledge, information and belief." Although a statement indicating an affidavit is based upon "information and belief" is usually insufficient, *Price v. Rochford*, 947 F.2d 829, 832–33 (7th Cir.1991), at the beginning of his declaration Rubio clearly states that "[e]xcept as otherwise indicated below, I make this Declaration based on personal knowledge." This is a sufficient indicia of personal knowledge to overcome the plaintiffs' objection.

■ The plaintiffs also claim paragraphs 8, 9 and 20 of Rubio's declaration should be stricken because there has been no predicate established for his expertise in taxation. Paragraph 8 states that food subsidies being provided by Arneses to its employees were not taxable as wages under the Mexican Social Security system; paragraph 9 states that on or about July 21, 1993, the Mexican laws were changed so as to make these subsidies taxable to Arneses' employees for purposes of Mexican Social Security. Paragraph 20 discusses an offer by Luis Perez that Arneses pay a food subsidy of 45,000 pesos per week to SEDCI in exchange for SEDCI lowing its prices to Arneses' employees, "and that this subsidy be falsely reported to the Mexican taxing authorities as deductible 'cleaning and maintenance' expenses." Rubio's position as an accounting manager for Alcoa's Texas and Mexico operations would have put him in a position to have direct personal knowledge of these statements; indeed, his assertions are made from personal knowledge, according to the first paragraph of his declaration. Furthermore, the statements in paragraph 20 are corroborated by other unobjected-to documents in the summary judgment record, e.g., a November 1993 memorandum from Luis Perez to Defendant Wacaser which proposes the 45,000 peso subsidy and that it be billed as "services performed such as· cleaning and maintenance of cafeterias and cleaning of outside patios." The plaintiffs' objections are overruled.

■ Exhibit G contains a photocopy of a July 1993 petition presented to Arneses by 116 of its workers. According to the English translation, the workers complained that SEDCI's food caused "stomach pains," that it was "not cooked properly," and that the quality had "gotten wors[e]" since SEDCI was awarded the contract. The plaintiffs' object to this document based on authentication and hearsay. Because neither the English translation nor the document itself are authenticated, the plaintiffs' objection is sustained, and the document will not be considered by the Court.

■ Exhibit H contains a report from Arneses' safety and hygiene inspectors which describes various problems with SEDCI's cooking facilities. The Spanish language original is not formally authenticated, but two circumstantial factors persuade the Court of its authenticity. First, all of the documents in question are dated and bear Arneses' company logo, pre-printed address and telephone number, all of which show authenticity. *See In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 293 (3d Cir.1983) (firm logo helps establish authenticity of memoranda); *Federal Trade Comm'n v. Hughes*, 710 F.Supp. 1520, 1522–23

(N.D.Tex.1989) (documents provided during discovery, on defendant's letterhead, held authentic under 901(b)(4)); *New Orleans Saints v. Griesedieck,* 612 F.Supp. 59, 62 (E.D.La.1985) (use of letterhead form demonstrates that form was made in course of regularly conducted business activity, thus authenticating it), *affd,* 790 F.2d 1249 (5th Cir.1986); *see also* FED. R. EVID. 901(b)(4) (characteristics and contents of document, taken in conjunction with circumstances, will authenticate it). Furthermore, the English translation is authenticated by an affidavit from the translator, which states that he has reviewed the original Spanish language document and that the "translation is, in every respect, a true and correct translation of said document." These are sufficient indicia or reliability and authenticity to overcome the plaintiffs' objections, which are therefore overruled.

■ The plaintiffs also object to Exhibit K on the grounds it is unauthenticated hearsay. The English translation of this document identifies it as "[a]nomalies from complaints from personnel in plant #2 about food service," which are arranged chronologically. Like Exhibit H, the Spanish language original is not authenticated. Although this exhibit also contains an affidavit from the translator which attests he has reviewed the original Spanish language document and that the "translation is, in every respect, a true and correct translation of said document," there are no other circumstantial factors which persuade the Court of its authenticity, i.e., the document is dated but bears no signature, company logo or letterhead. The plaintiffs' objections to this document are therefore sustained, and the document will not be considered by the Court.

■ Exhibits U and W contain Spanish language newspaper reports of charges which were allegedly filed against Luis Perez

by Mexican authorities for writing bad checks (Exhibit U), and strikes by SEDCI's workers for nonpayment of salaries and other grievances (Exhibit W). Plaintiffs again object that these exhibits are unauthenticated hearsay. Newspaper articles, however, are self-authenticating under FED. R. EVID. 902(6). *Price v. Rochford,* 947 F.2d 829, 833 (7th Cir.1991); *Orloff v. Cleland,* 708 F.2d 372, 378 n. 6 (9th Cir.1983). As for the hearsay objections, the articles may be considered to the extent they are being offered not to prove the truth of the matters asserted, but only that they were reported. The plaintiffs' objections are overruled.[2]

### The Cast of Characters

Plaintiff Servicios Especializados de Comedores Industriales (SEDCI) operated a restaurant and catering business in the city of Acuna, Coahuila, Mexico. In June of 1993, SEDCI entered into a food service agreement with Defendant Arneses y Accessorios de Mexico, S.A. de C.V. (Arneses) to provide catering services for its factories, or Maquiladoras,[3] in Acuna. These factories assemble wiring harnesses for the U.S. automotive and truck industry. Defendant Alcoa Fujikura, Ltd., Arneses' parent corporation, is an American corporation licensed to do business in Texas, with an office in Del Rio, Texas.

SEDCI's organization is not clear from the summary judgment record. Luis Perez's affidavit and deposition testimony claim it was a partnership formed between himself and his wife, Margarita Perez, and was registered to do business in Mexico under the name SEDCI through his wife's registration number, because she was a Mexican citizen. The defendants claim SEDCI was Margarita Perez's sole proprietorship under Mexican law. According to Margarita's deposition, the business was created in her name because it was not possible under Mexican law

---

**2.** Although both exhibits include English translations, only the translation of Exhibit W is accompanied by an affidavit from the translator attesting he has reviewed the Spanish language original and that the "translation is, in every respect, a true and correct translation of said document." Because, however, there are no objections to any of the defendants' English translations, the Court need not address this issue.

**3.** A Maquiladora is a unique business on the Mexican–American border whereby the American business maintains a Mexican subsidiary, or Maquiladora, usually to conform to Mexican labor and tax laws.

for her husband, an American citizen, to have a business in his name. The business appears to have used bank accounts in her name as well as her husband's, and Margarita's deposition testimony also shows she had little involvement in providing food services to Arneses' employees (other than going there "every day" to taste the food) or the day-to-day affairs of SEDCI, leaving most of these responsibilities to her husband. In any event, because the Court can only resolve factual discrepancies in a motion for summary judgment in favor of the non-moving party, the Court will assume Luis Perez had at least a partial ownership interest in SEDCI.

*The Agreement*

The food service agreement was signed on June 24, 1993, by Luis Perez for SEDCI and on June 25, 1993, by Horace H. Wacaser for Arneses. It contained the following stipulations

1) SEDCI agrees to provide meals and food service to Arneses Y Accessorios De Mexico, S.A. de C.V. Acuna Plants # 1 & 2 beginning July 25, 1993.

2) SEDCI agrees to provide $ 1.00 plate and $1.20 plate as detailed in Attachment A for a period of two years without, cost increase.

3) SEDCI agrees to be responsible for hiring its employees and insuring that they maintain high levels of cleanliness, health cards, and certificates maintained up to date and to abide by all government standards and policies of Arneses Y Accessorios de Mexico, S.A. de C.V.

4) SEDCI agrees to provide the equipment and utensils needed to provide stated service.

5) SEDCI agrees to provide a cafeteria Manager to oversee the operation.

6) SEDCI agrees to abide by the policies for contracted services as to Safety, Health, and Environment which will be fully explained to SEDCI representatives.

7) SEDCI agrees to provide food service to Arneses Y Accessorios De Mexico, S.A. de C.V. for special occasions such as Christmas parties, etc. at cost.

8) SEDCI agrees to maintain all facilities in a clean state and equipment to be functional.

9) SEDCI agrees to start with Plants # 1 & 2 as Phase I and to work toward establishing a central cooking facility long term and to be able to provide for providing service to remaining Arneses plants, 60 to 90 days after July 12, 1993.

10) Either party may terminate agreement provided a 60 day notice is given, in writing, to both parties.

11) SEDCI assumes full legal responsibilities as to sickness, injuries, and such if caused by the food quality, etc.

*The Dispute*

SEDCI began serving Arneses' plants 1 and 2 in July of 1993. Almost immediately after the agreement was signed, however, disputes arose concerning the quality of the food and the service. Health, safety and hygiene inspectors from Arneses would routinely visit SEDCI's cooking facilities and wrote up long lists of deficiencies concerning the quality of the food and the service. On August 6, 1993, for example, Arneses' safety and hygiene department inspected SEDCI's kitchen and found, among other things, food which had been served two days before still sitting in the deep fryer; cigarette butts on the kitchen floor; aprons "stored in a little closet exposed to the cockroaches seen in it;" pieces of flour tortillas under the deep fryer; soy packets in the refrigerator; potatoes which were stale or already rotten; flies and cockroaches inside and outside the premises. On August 23rd Luis Perez received a memorandum from Arneses' safety and hygiene department which complained about "trash bins in the dining room full of trash, with a smell that was too irritating. It could be smelled all the way to the production lines." Four days later Arneses again visited SEDCI's kitchen and found water on the floor, "lids and pots that seemed clean on the floor," and personnel preparing food who "were doing so with their bare hands, no gloves, no spoons," and a kitchen area that was "too hot." Arneses' inspectors feared this would cause "workers to perspire and

[their] perspiration to fall into the food being prepared."

Regarding these complaints about SEDCI's food service, Defendant Wacaser testified as follows:

We had many complaints from the first week that SEDCI started delivering. The food was not delivered on time, the food was not warm as it had been agreed to, quantities of food [were] not sufficient on each plate, there were health problems with the food. I personally reviewed a cockroach, not a whole cockroach but half a cockroach, that one of the ladies brought to me out of plant 6, I believe it was, and I had it held for me and I reviewed it.

We had employees that were threatening to strike because the food was not sufficient and the food had insects. We had the report of a half a rat in one of the plates. I did not personally see it, but my manager saw [it]. So there were many, many complaints. And it cost our company much, much lost production time because of having to deal with people that were signing petitions to strike, all brought about by the poor food service from SEDCI.[4]

*The Employee Subsidy*

Since approximately 1981, Arneses had subsidized various meals and beverages purchased by its employees from on-site vendors in Arneses' Acuna plants, including SEDCI. Until late September of 1993, Arneses was subsidizing "regular" employee meals at a 70 percent rate, with the employee paying only 30 percent of the cost out his or her own pocket; and "overtime" meals were subsidized at a 100 percent rate, with the employee paying nothing. These subsidies were paid directly to the employees but were not taxable under the Mexican Social Security system. In July of 1993, however, the Mexican laws were changed so as to make these subsidies taxable. Arneses decided to discontinue the 70 percent "regular" meal and beverage subsidy but made no changes to the 100 percent "overtime" meal and beverage subsidy. Arneses increased one of the other portions of its employee benefit package, the "food coupon program," which allowed Arneses' employees to buy groceries in Acuna with coupons provided by Arneses. While the "regular" meal and beverage subsidy was in place, Arneses' employees had to choose between bringing their lunch from home at their own expense, buying lunch from SEDCI at a 70 percent discount or buying their lunch elsewhere at full cost out of their own pocket. When the meal and beverage subsidy was replaced with the coupon program, however, Arneses' employees had a choice between bringing their lunch from home, or buying from SEDCI or someone else. In the weeks and months following this decision, Arneses' employees appear to have "voted with their feet" against SEDCI and in favor of other vendors.

*Termination of the Subsidy*

Arneses notified its employees of the discontinuation of the 70 percent subsidy on "regular" meals and beverages by memorandum on September 23, 1993, which indicted this change would become effective on September 27, 1993. SEDCI learned of this change about the same time, but did not exercise its termination rights under paragraph 10 of the contract. In the weeks that followed, Arneses continued to receive complaints about the quality of SEDCI's food and service. In a memorandum dated November 15, 1993, Luis Perez stated that "Cleanliness of Cafeterias" is one of the "ma-

4. Regarding this excerpt from Wacaser's deposition, the plaintiffs' response states they "have attached the entire deposition of Mr. Wacaser and encourages [sic] this Court to read the deposition for all of its inconsistencies." Interestingly, however, they do not attempt to refute the statement with appropriate page references to Wacaser's deposition (which is 75 pages long) or citations to the other summary judgment evidence. Indeed, the plaintiffs fail to provide a single citation to the summary judgment record to support any of the assertions contained in their statement of material facts, or their substantive discussions of the legal and factual issues. The Court's October 13, 1995 Scheduling Order clearly provided that "[t]he papers opposing a motion for summary judgment shall include a separate statement of material facts, including record references, as to which it is contended there exists a genuine issue for trial. *The facts set of forth in movant's statement of material facts may be deemed admitted unless controverted by the non-movant's statement of material facts.*" (Emphasis added).

jor problems we have confronted during the past 3 months" in Arneses' plants 1, 2, 4, and 5. This memorandum also proposed that Arneses pay a food subsidy of 45,000 pesos per week to SEDCI in exchange for SEDCI lowering its prices to Arneses' employees; and that this subsidy be reported (according to the defendants, falsely reported) to the Mexican taxing authorities as deductible "cleaning and maintenance" expenses. Arneses declined the proposal.

### The Loan to SEDCI

SEDCI, meanwhile, was having problems paying some of its bills and open accounts, and some of the unpaid vendors began to approach Arneses for payment. In a memorandum dated November 26, 1993, Luis Perez asked H.H. Wacaser for help paying SEDCI's accumulated unpaid bills, totaling 285,592.74 pesos, and promised to have SEDCI pay back this sum to Arneses "in invoices over the course of eighteen months." Based on financial information provided by SEDCI, Arneses agreed to loan money to SEDCI, and a loan contract to that effect was drawn up and signed by the parties on December 3, 1993. The loan contract provided that Arneses would pay twelve SEDCI creditors a total of 97,382.50 pesos on behalf of SEDCI, and that SEDCI, Luis Perez and Margarita Perez would collectively owe Arneses repayment of $30,000 U.S. dollars by April 1, 1994. The loan was secured by a $30,000 draft signed by the debtors that could be presented to their bank in the event of non-payment or discontinuation of SEDCI's food services.

### Arneses' Termination of the Contract

In December 1993 a Mexican newspaper reported that Luis Perez was accused by Mexican authorities of writing checks which were dishonored by SEDCI's bank for insufficient funds. In January 1994 a Mexican newspaper reported that 43 employees of SEDCI went on strike for non-payment of wages and other grievances. On January 21, 1994, SEDCI's services to plants 4 and 5 were terminated. On January 26, Arneses notified SEDCI by letter that "since your company is not performing as stipulated, we serve you notice that we deem the contract concluded in 60 days. . . ." In acknowledging

receipt of this notice, Luis Perez signed and added the following handwritten notation: "This signature is only Plants 1 and 2, since we have been removed from Plants 4, 5, and 6 and Operations with no notice." On September 1, 1995, Arneses formally demanded repayment of the $30,000 loan from Luis Perez, Margarita Perez and SEDCI.

### The Lawsuit

The plaintiffs claim that Arneses' termination of the subsidy made it impossible for them to perform the agreement. According to the plaintiffs, the defendants orally promised at the time the food service agreement was signed that they would contribute the subsidy for employee meals so that $1.00 to $1.20 meals would actually be available to employees for $.30. The defendants do not dispute providing a subsidy to their employees, but maintain the food subsidy was discontinued only in reaction to changes in Mexican tax law and Mexican employee benefit law, and that the continuing existence of the subsidy was not part of any contractual obligation. The plaintiffs assert claims for breach of contract, violation of the Texas Deceptive Trade Practices Act (DTPA), promissory estoppel, quantum meruit, fraud, and intentional infliction of emotional distress. They seek $2,360,000 damages based on their two-year projected earnings under the contract. The defendants have counterclaimed for (1) breach of contract based on the plaintiffs' failure to perform the food service agreement, and (2) for recovery of $30,000 which Arneses loaned the plaintiffs.

### Discussion

#### Introduction

Defendants move for summary judgment both on the plaintiffs' causes of action and their counterclaims. Rule 56(c) of the Federal Rules of Civil Procedure allows summary judgment only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). All reasonable doubts and inferences must be decided in the light most favorable to the party opposing the motion, *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 640 (5th Cir.1985), and as long as there

appears to be some evidentiary support for the disputed allegations, the motion must be denied. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Coke v. General Adjustment Bureau,* 640 F.2d 584, 595 (5th Cir.1981) (en banc).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, along with affidavits, if any, which it believes demonstrate the absence of genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Where the nonmovant bears the burden of proof on a claim upon which summary judgment is sought, the movant may discharge its summary judgment burden by showing that there is an absence of evidence to support the nonmovant's case. *Id.* at 325, 106 S.Ct. at 2553–54. Once the movant satisfies this burden, the nonmovant may then oppose the motion by going beyond the pleadings and by its own affidavits or by depositions, answers to interrogatories, and admissions on file designating specific facts showing a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. Summary judgment will be granted against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

*Choice of Law*

■ Although the defendants argue that Mexican law governs this dispute, their motion for summary judgment moves for summary judgment both under Texas and Mexican law. The plaintiffs do not contest the defendants' discussion of Mexican law, but instead argue that Texas law, which would not preclude most of their claims, controls. Because determination of the choice of law is necessary before the Court may address the defendants' summary judgment motion, the Court will first consider their motion for the application of Mexican law. "[T]he facts on which choice-of-law depends are properly determined by the Court after considering the affidavits, depositions, and other matters submitted by the parties." *Nunez v. Hunter Fan Co.,* 920 F.Supp. 716, 718 (S.D.Tex. 1996).

■ Under *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22 85 L.Ed. 1477 (1941), this Court must apply the Texas choice of law rules. In the absence of an effective choice of law provision, § 188(1) of the *Restatement (Second) of Conflicts of laws ("Restatement")* provides the general rule: "The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles listed in § 6." *Maxus Exploration Co. v. Moran Bros., Inc.,* 817 S.W.2d 50, 53 (Tex. 1991) (quoting § 188(1) of the *Restatement* ); *see also DeSantis v. Wackenhut Corp.,* 793 S.W.2d at 670, 678–79 (Tex.1990). Section 196 of the Restatement provides that contracts for the rendition of services, in the absence of an effective choice of law by the parties, are enforced under the laws of the state where the contract requires that the services be rendered, unless some other state has a more significant relationship. *See Maxus Exploration Co. v. Moran Bros., Inc.,* 817 S.W.2d 50, 53 (Tex.1991); *DeSantis,* 793 S.W.2d at 679. "In the case of a contract for the rendition of services, section 196 [of the *Restatement* ] accords the place of performance paramount importance." *Maxus,* 817 S.W.2d at 53.

Section 196's presumption, however, is not conclusive. If an analysis of the relevant contacts[5] shows that another state has a more significant relationship to the claims, then that state's laws should be applied. *See Nunez,* 920 F.Supp. at 719; *Farris v. ITT Cannon,* 834 F.Supp. 1260, 1267 (D.Colo. 1993); *see also Pruitt v. Levi Strauss & Co.,*

---

5. Section 188(2) of the Restatement lists the factors that should be considered in a contracts case: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Maxus,* 817 S.W.2d at 53 (quoting § 188(2) of the *Restatement* ).

932 F.2d 458, 461 (5th Cir.1991) (following the "general rule" of § 196 after concluding no other state had a more significant relationship to the issue), *abrogated on other grounds, Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.,* 55 F.3d 181, 185–86 (5th Cir. 1995).

 The relevant contacts in this case favor the application of Texas law. This lawsuit arises out of two contracts: (1) the June 1993 food service agreement between SEDCI and Arneses, and (2) the December 1993 loan agreement between the plaintiffs and Arneses in the amount of $30,000. Of these contracts, only the $30,000 loan agreement contains any kind of choice-of-law provision. Clause seven of the loan agreement provides that "[b]oth parties agree that whatever is not covered by this agreement will be supplemented by the civil laws of the State of Coahuila."

In contrast to the loan agreement, however, the food service agreement between Arneses and SEDCI contains no choice of law provision and, therefore, is subject to the "most significant relationship" analysis. Application of the *Restatement* factors shows the food service agreement was signed in Texas; it was negotiated in both Texas and Mexico; it was performable in Acuna, Coahuila, Mexico, where Arneses' Maquiladora plants are located; the subject matter of the contract concerned food services to Arneses and its employees. As for the parties' domicile, residence and nationality, Margarita Perez was a citizen of Mexico residing in Del Rio, Texas. Luis Perez was a United States citizen residing in Del Rio, Texas. His affidavit attests that "[a]t all times relevant to this suit I was a citizen an[d] resident of Texas." [6] SEDCI and Arneses are Mexican entities, but Arneses is owned by Alcoa Fujikura, Ltd., a United States corporation with an office in Del Rio. Wacaser testified during his deposition that at the time of the agreement between SEDCI and Arneses he was the vice-president of Alcoa's automotive operations in North America, a position which gave him "senior operating responsibility" over Arneses and "the other operations within Mexico." Wacaser recalled he had offices in Del Rio, Acuna, and San Antonio during the events which gave rise to this lawsuit.

 Although the place of performance of a contract is often "conclusive" in deciding which state's law applies, *see DeSantis,* 793 S.W.2d at 679; the express language of § 196 "contemplates situations in which the principles enunciated in § 6 would justify the application of another state's law." *Nunez,* 920 F.Supp. at 721. Section 6 of the *Restatement* lists certain policy considerations a court should consider in making the choice of law:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Maxus,* 817 S.W.2d at 53 (quoting § 6 of the *Restatement*). "Under § 6, choice of law hinges not upon the number of contacts but on their quality." *Nunez,* 920 F.Supp. at 720; *see also Gulf Consol. Services, Inc. v. Corinth Pipeworks, S.A.,* 898 F.2d 1071, 1075 (5th Cir.1990) ("Some contracts are more important than others because they implicate state policies underlying the particular substantive issue."); *Gutierrez v. Collins,* 583 S.W.2d 312, 318 (Tex.1979) (application of the most significant relationship test does not "turn on the number of contacts, but more importantly on the qualitative nature of those contacts as affected by the policy factors enumerated in Section 6."); *Restatement* § 145 ("contacts are to be evaluated according to their relative importance with respect to the particular issue").

Most important here are the relevant policies of the forum state and of the other state

---

**6.** Perez's affidavit also informs the Court that Margarita Perez became a U.S. citizen in April 1996.

alleged to have an interest in the application of its laws to the case. Texas, the forum state, undoubtedly has a strong interest in the application of Texas law to its residents and to employment activities which occur within its boundaries, as well as to litigation within its forum. *See Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 891 (5th Cir.1991); *Garcia v. Total Oilfield Services, Inc.*, 703 S.W.2d 411, 415 (Tex.App.—Amarillo 1986), *as modified*, 711 S.W.2d 237 (Tex.1986). Although Mexico has an interest in ensuring that its corporate activities are governed by its own employment and contractual rules, this interest is attenuated in the present case for two reasons. First, the lawsuit involves two Mexican entities which have strong ties to the United States: SEDCI is at least partially owned (and was represented during the contractual negotiations) by a Texas citizen and resident, and Arneses is owned by an American corporation, Alcoa Fujikura, which maintains an office just across the border in Del Rio, Texas, where some of the contractual negotiations took place. Second, and more important, is the fact that the contract was signed in Del Rio and negotiated in both Texas and Mexico. Although standing alone, these factors would not hold sway, combined with the other facts of this case, they would have given the plaintiffs a justifiable expectation that Texas law would apply. Finally, in regards to those § 6 factors which point to predictability of outcome and the expectations of the parties, it can hardly be said that an American corporation which maintains an office on the Texas border, and then signs and negotiates an agreement with a Texas resident in that same border town, would be unfairly surprised to have Texas law applied to the agreement. Thus, the § 6 test shows that Texas has the most significant relationship to this case.

■ As for the plaintiffs' tort claims (common law fraud, fraudulent scheme, in-tentional infliction of emotional distress, and negligent misrepresentation), "all conflicts cases sounding in tort will be governed by the 'most significant relationship' test as enunciated in §§ 6 and 145 of the Restatement (Second) of Conflicts." *Gutierrez*, 583 S.W.2d at 318.[7] Although the Court recognizes that § 145 provides specific guidance for tort cases, the "alleged torts are clearly derivative of, and completely interrelated with, the breach-of-contract claim." [8] *Nunez*, 920 F.Supp. at 721. The Court has already discussed these principles once, and it need not do so again. Accordingly, the same § 6 analysis of the plaintiffs' breach of contract claim will govern their tort claims.

■ Although the Court is persuaded Texas law should govern this dispute, it is worth noting that even if the Court were to apply Mexican law as the defendants claim it should, the result here would be the same—defendants would still be entitled to summary judgment. The plaintiffs do not attempt to rebut the defendants' discussion of Mexican law or their supporting declaration from David Lopez, an associate professor of law with St. Mary's University School of Law in San Antonio, Texas and an authority on the laws of Mexico. *See* Declaration of David Lopez, Defendants' Motion for Summary Judgment. Indeed, the plaintiffs' response to the defendants' motion for summary judgment concedes that most of the plaintiffs' Texas causes of action "are not found under Mexican law," and that "[t]he only remedy Plaintiffs would have under Mexican law is breach of contract."

Professor Lopez's declaration states that "Mexican law provides for contract-based recovery but does not allow claims in the nature of quasi-contract or tort." *Id.* Professor Lopez also states that "Articles 273 to 308 of the Mexican Commercial Code govern agency contracts and, therefore, contracts analo-

---

**7.** According to § 145, the factors a court should consider for tort cases are: "(a) tile place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Gutierrez*, 583 S.W.2d at 319 (quoting § 145(2) of the *Restatement*).

**8.** The plaintiffs' third amended complaint alleges damages for "mental anguish, loss of credit standing, loss of business, loss of business reputation, loss of business opportunity, loss of income, [and] loss of wages."

gous to agency agreements such as the SED-CI–Arneses food service agreement." *Id.* Under these provisions, SEDCI would be entitled to recover for services which it has provided but for which it has not been paid; and it would be entitled to remuneration at the rate agreed to by the parties, or absent such an agreement, to remuneration based on the "customary fee at the place" where SEDCI provided these services. *See* MEXICAN CIVIL AND COMMERCIAL CODES 764–65 (West 1995, translated by Abraham Eckstein & Enrique Zepeda)("Unless otherwise agreed, all agents are entitled to remuneration for their services. If no agreement is made as to the remuneration, it shall be determined by what is the customary fee at the place where the agency is performed."); *see also* Declaration of David Lopez, Defendants' Motion for Summary Judgment. Thus, assuming for the sake of argument that Mexican law applies, the defendants orally promised SEDCI they would provide an employee subsidy, and that such an agreement is enforceable under Mexican law, the plaintiffs have failed to raise an issue of material fact under Mexican law as to whether they provided services to Arneses for which they were not paid.

*The Breach of Contract Claim*

The defendants argue that the plaintiffs' breach of contract claim, which attempts to recover for Arneses' modification of the employee subsidy, is unenforceable because of the Texas statute of frauds and the parol evidence rule. The second of these issues will be the focus of the Court's discussion.

The parol evidence rule is a rule of substantive law which provides that extrinsic evidence is not admissible to vary, add to, or contradict the terns of a written instrument that is facially complete and unambiguous. *Brannon v. Gulf States Energy Corp.,* 562 S.W.2d 219, 222 (Tex.1977); *Markert v. Williams,* 874 S.W.2d 353, 355 (Tex.App.—Houston [1st Dist.] 1994, writ denied); *Martin v. Ford,* 853 S.W.2d 680, 681 (Tex.App.—Texarkana 1993, writ denied); *Massey v. Massey,* 807 S.W.2d 391, 405 (Tex.App.—Houston [1st Dist.] 1991), *writ denied,* 867 S.W.2d 766 (Tex.1993); *see also* JOHN D. CALAMARI AND JOSEPH M. PERILLO, CONTRACTS

§ 3–2, at 135–36 (3rd ed.1987). As a substantive rule of law, the parol evidence rule denies efficacy to prior or contemporaneous expressions relating to the same subject matter as that encompassed in the final written contract between the parties. *Pan American Bank v. Nowland,* 650 S.W.2d 879, 884 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.). Only if the intention of the parties as expressed on the face of the document is doubtful may the court resort to parol evidence to resolve the doubt. *Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527, 529 (Tex.1987); *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981); *Markert,* 874 S.W.2d at 355; *Entzminger v. Provident Life & Accident Ins. Co.,* 652 S.W.2d 533, 537 (Tex.App.—Houston [1st Dist.] 1983, no writ).

Texas allows an exception to the parol evidence rule when a party offers parol evidence to show fraud in the inducement to enter into a contract. *Federal Deposit Ins. Corp. v. Wallace,* 975 F.2d 227, 229 (5th Cir.1992). In order to invoke this exception, however, the plaintiffs must show "trickery, artifice, or device" by the defendants in addition to showing the defendants made false representations. *Rosas v. U.S. Small Business Admin.,* 964 F.2d at 356 (citing *Simpson v. MBank Dallas, N.A.,* 724 S.W.2d 102 (Tex.App.—Dallas 1987, writ ref'd n.r.e.)). Parties to contracts are charged with knowledge of their provisions and are barred from claiming fraud unless they can show they were tricked into execution. *Town North Nat'l Bank v. Broaddus,* 569 S.W.2d 489, 492 (Tex.1978).

In the present case, the plaintiffs have not alleged fraud in the inducement and there is no summary judgment evidence—apart from conclusory allegations—of trickery or artifice. The plaintiffs' allegations of simple fraud cannot overcome the parol evidence rule. In order to invalidate a contract the fraudulent representation must have been relied upon to the extent it was a controlling factor in inducing the making of the contract. *Neuhaus v. Kain,* 557 S.W.2d 125, 138 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.). In this case, however, the

plaintiffs have not shown the use of any trickery, artifice or device, other than the defendants' alleged representations to provide the employee subsidy. This is not enough to overcome the parol evidence rule. To quote the Fifth Circuit:

> If fraud could be predicated on a party's allegation of any oral promise to vary the express terms of the [contract], then any collateral parol agreement might be asserted to contradict, vary or even abrogate any written contract. The result would destroy the parol evidence rule altogether resulting in uncertainty and confusion in the law of contracts. . . .

*Rosas v. U.S. Small Business Admin.*, 964 F.2d at 356; *Town North Nat'l Bank*, 569 S.W.2d at 492.

▮▮▮▮ Nor does the summary judgment evidence show the contract is incomplete or ambiguous. In construing a contract, the court must give effect to the objective intent of the parties as expressed or apparent from the writing, in light of the surrounding circumstances. *Praeger*, 721 S.W.2d at 600–01. A contract is not ambiguous if, after applying the rules of construction, the provision in question can be given a certain or definite legal meaning or interpretation. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 158 (1951). In Texas, courts enforce unambiguous instruments as written, and in the ordinary case, the writing alone will be deemed to express the intention of the parties. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 728 (Tex.1981); *Rutherford v. Randal*, 593 S.W.2d 949 (Tex.1980); *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515 (Tex.1968). An instrument is not ambiguous simply because the parties disagree over its interpretation. *REO Indus. v. Natural Gas Pipeline Co.*, 932 F.2d 447, 453 (5th Cir.1991); *Markert*, 874 S.W.2d at 355; *Praeger v. Wilson*, 721 S.W.2d at 600 (Tex.App.—Fort Worth 1986).

▮▮▮▮ The plaintiffs note that the parol evidence rule does not prevent enforcement of a prior or contemporaneous agreement which is collateral to, not inconsistent with, and does not vary or contradict the express or implied terms or obligations thereof. *Boy Scouts of America v. Responsive Terminal Sys., Inc.*, 790 S.W.2d 738, 745 (Tex.App.—Dallas 1990, writ denied); *see Hubacek v. Ennis State Bank*, 159 Tex. 166, 317 S.W.2d 30, 32 (1958); *Weinacht v. Phillips Coal Co.*, 673 S.W.2d 677, 680 (Tex.App.—Dallas 1984, no writ); *Bowers Steel, Inc. v. DeBrooke*, 557 S.W.2d 369, 373 (Tex.Civ.App.—San Antonio 1977, no writ). They claim the employee subsidy is such an agreement. To be collateral, however, the oral agreement must be one the parties might naturally make separately and would not be ordinarily expected to embody in the writing; furthermore, the allegedly collateral agreement must not be so clearly connected with the principal transaction as to be part and parcel thereof. *Boy Scouts*, 790 S.W.2d at 745; *Weinacht*, 673 S.W.2d at 680; *Leyendecker v. Strange*, 204 S.W.2d 845, 847 (Tex.Civ.App.—Galveston 1947, writ ref'd n.r.e.).

In the present case, the agreement between SEDCI and Arneses clearly states that SEDCI will "provide $1.00 plate[s] and $1.20 plate[s] as detailed in the Attachment A for a period of two years without cost increase." The employee subsidy, which the plaintiffs claim is a material provision of the agreement, is not mentioned anywhere in the writing which memorializes the parties' agreement. Indeed, the agreement does not mention a subsidy or even state it is contingent on a subsidy, and there are no allegations of accident, mistake, or fraudulent inducement. Because the Court finds that the contract is straightforward and unambiguous in its terms and because the alleged oral promise would clearly contradict the express terms of the contract, evidence of that promise may not be used to support a claim for breach of contract. The Court also finds that the alleged oral agreement in this case is not collateral to, and is an attempt to vary, the written agreement between the parties. Consequently, the parol evidence rule prevents enforcement of the alleged agreement. The plaintiffs, therefore, have no basis for their claim of breach of contract, and the defendants are entitled to summary judgment on this issue.

**1008**

*Negligent Misrepresentation*

 The plaintiffs' claim for negligent misrepresentation,[9] like their other causes of action, is based on the defendants' alleged representation that it would provide a subsidy for employee meals and, more importantly, that it would continue to do so in the future. Even if the Court assumes, as it must, that Arneses promised SEDCI it would provide an employee subsidy and that it would continue to provide the subsidy in the future, there is no summary judgment evidence the alleged representation was false when it was made. In other words, there has been no showing it was a misstatement of an *existing* fact. At most, the defendants' representations concerned a future action by Arneses, i.e., providing the subsidy.

 This is not enough to sustain a claim for negligent misrepresentation. "A claim for negligent misrepresentation under Texas law contemplates that the 'false information' provided by the defendant is a misstatement of existing fact." *Clardy Mfg.,* 88 F.3d at 357; *see also Airborne Freight Corp. v. C.R. Lee Enters.,* 847 S.W.2d 289, 294 (Tex.App.—El Paso 1992, writ denied). "Negligent misrepresentation does not occur when a defendant simply makes a guess as to a future, unknown event." *Sergeant Oil & Gas Co. v. National Maintenance & Repair, Inc.,* 861 F.Supp. 1351, 1360 (S.D.Tex.1994) (holding defendant's representation that the barge could be loaded in eighteen to twenty-four hours was not actionable under a theory of negligent misrepresentation); *see also Clardy Mfg.,* 88 F.3d at 357–58 (bank officer's representation that loan commitment letter would issue within two to five days was not actionable as a misstatement of existing fact; the loan officer's representation was, at most, a misstatement as to a future action); *5636 Alpha Road v. NCNB Texas Nat'l Bank,* 879 F.Supp. 655, 665 (N.D.Tex.1995) (bank officer's representation that he needed

additional authority, but that loan was a "done deal" and that it would be renewed at the end of four months referred to the bank's future performance, and were therefore not actionable under a theory of negligent misrepresentation); *City of Beaumont v. Excavators & Constructors, Inc.,* 870 S.W.2d 123, 138 (Tex.App.—Beaumont 1993, writ denied) (holding that statements as to how long a work project would take to complete were not "false information"). The defendants are therefore entitled to summary judgment on the plaintiffs' claim for negligent misrepresentation.

*Fraud*

 Under Texas law, to recover for fraud the plaintiffs must establish: (1) a material representation was made; (2) it was false when made; (3) the speaker knew it was false, or made it recklessly without knowledge of its truth and as a positive assertion; (4) the speaker made it with the intent that it should be acted upon; and (5) the party acted in reliance and suffered injury as a result. *Clardy Mfg.,* 88 F.3d at 359; *Roberts v. United New Mexico Bank,* 14 F.3d 1076, 1078 (5th Cir.1994). "To be actionable, the misrepresentation must be 'one concerning a material fact; a pure expression of opinion will not support an action for fraud.'" *Clardy Mfg.,* 88 F.3d at 359 (quoting *Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 276 (Tex.1995)). An opinion may constitute fraud if the speaker knows it is false. *Sergeant Oil & Gas Co. v. National Maintenance & Repair, Inc.,* 861 F.Supp. 1351, 1358 (S.D.Tex.1994). "An expression of an opinion as to the happening of a future event may also constitute fraud where the speaker purports to have special knowledge of facts that will occur or exist in the future." *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983).

---

**9.** Under Texas law, in order to recover for negligent misrepresentation the plaintiffs must show that (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiffs suffer pecuniary loss by justifiably relying on the representation. *Clardy Mfg. Co. v. Marine Midland Business Loans,* 88 F.3d 347, 357 (5th Cir.1996); *Federal Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991) (citing the Restatement (Second) of Torts (1977)).

■ A promise to do something in the future is actionable fraud "only when made with the intention, design and purpose of deceiving, and with no intention of performing the act" at the time the promise was made. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex.1986); *see also Airborne Freight Corp. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 294 (Tex.App.—El Paso 1992, writ denied). The mere failure to perform a promise does not constitute evidence of the promisor's intent not to perform at the time the promise was made. *Spoljaric*, 708 S.W.2d at 435; *Porter v. Irvine*, 658 S.W.2d 711, 714 (Tex.App.—Houston [1st Dist.] 1983, no writ); *see Airborne Freight*, 847 S.W.2d at 294.

■ The Court recognizes that intent not to perform a promise at the time it was made may be shown by circumstantial evidence, including the subsequent conduct of the promisor, *Beijing Metals and Minerals v. American Business Center*, 993 F.2d 1178, 1185 (5th Cir.1993); that "[s]light circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent," *Spoljaric*, 708 S.W.2d at 435 (internal quotations omitted); and that summary judgment is rarely proper in such cases because "[i]ntent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given their testimony." *Beijing Metals*, 993 F.2d at 1185 (quoting *Spoljaric*, 708 S.W.2d at 435).

■ In this case, however, even if one assumes the defendants promised to maintain the employee subsidy, there simply is no summary judgment evidence (circumstantial or otherwise) from which the Court could infer that the defendants intended to deceive the plaintiffs at the time the promise was made. The plaintiffs' response to the defendants' motion for summary judgment claims, for example, that at the time of the original negotiation and contract between Wacaser and Luis Perez, "that Wacaser, individually and on behalf of his corporate employers, Alcoa and Arneses, knew that the subsidy was going to change and acted recklessly with regard to the representation that he would provide the subsidy." To support this assertion, however, the plaintiffs add only the following perfunctory statement: "The representation turned out to be false, that is they [defendants] quit providing the subsidy. It was, therefore, a misrepresentation." Again, there is no reference to summary judgment evidence, circumstantial or otherwise, which might support the assertion. The Court has reviewed the record and does not find the evidence alluded to by the plaintiffs. The plaintiffs also claim that "[t]he representation that Mexican law prohibited the subsidy was also false," yet they offer nothing in the way of summary judgment evidence or substantive legal discussion to rebut this statement, which is found in the declaration of Ruben Rubio. The plaintiffs further claim that Luis and Margarita Perez acted in reliance on these alleged misrepresentations and suffered damages, yet they do not indicate the nature of their reliance or what damages they suffered. Finally, the plaintiffs claim that "[i]n addition to the subsidy program, there were representations made after the end of September of 1993, whereby Alcoa and Arneses were to help SEDCI." Again, however, the plaintiffs do not tell us what these representations were or when they were made. Given these shortcomings, their fraud claim must *fail*. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (Opponent of a summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts."). The defendants are therefore entitled to summary judgment on this issue.

*DTPA*

■ According to the plaintiffs' third amended complaint, they brought this suit "pursuant to the DTPA § 17.50(a)(1)(2)(3); § 17.46(b)(2)(5)(7)(8)(11) and (23) against all Defendants in this cause for Wacaser's actions, as alleged in the above paragraphs, in his individual and representative capacity for Alcoa and Arneses." [10] As with the plaintiffs'

---

10. The provisions of § 17.46(b) cited by the plaintiffs provide as follows: (2) causing confu-

other claims, the crux of their DTPA complaint concerns the defendants' alleged promise to maintain the employee subsidy. Texas courts have repeatedly held that the mere nonperformance of a contract is not actionable as a deceptive or unconscionable act under the DTPA. *See Crawford v. Ace Sign,* 917 S.W.2d 12 (Tex.1996); *Ashford Dev., Inc. v. USLife Real Estate Services,* 661 S.W.2d 933, 935 (Tex.1983) ("An allegation of a mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act' in violation of the DTPA."); *Posey v. Southwestern Bell Yellow Pages, Inc.,* 878 S.W.2d 275, 280 (Tex.App.—Corpus Christi 1994, no writ) ("mere breach of contract cannot constitute the false, misleading, or deceptive act alleged as a violation of the DTPA"). In rejecting the plaintiff's contentions in *Crawford,* the Texas Supreme Court concluded:

> The essence of these allegations is that: (1) the defendants represented that they would perform under the contract, and (2) non-performance means that they misrepresented that they would perform under the contract. To accept this reasoning, however, would convert every breach of contract into a DTPA claim.

*Crawford,* 917 S.W.2d at 14. The Fifth Circuit also has recognized this principle. In *Helms v. Southwestern Bell Tel. Co.,* 794 F.2d 188 (5th Cir.1986), for example, the Fifth Circuit affirmed the dismissal of a DTPA claim arising out of errors in a published yellow pages advertisement because

"[t]he 'misrepresentation' alleged by the Helmses was nothing more than Southwestern Bell's failure to perform its promise to correctly print the ad." *Id.* at 191. Since the plaintiffs' DTPA claims are based solely on the alleged failure of the defendants to perform a contractual promise, and the plaintiffs have failed to raise an issue of material fact regarding these claims, the defendants are therefore entitled to summary judgment on the plaintiffs' DTPA claims.

*Intentional Infliction of Emotional Distress*

 The Texas Supreme Court recognized the tort of intentional infliction of emotional distress in *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993) (adopting Restatement (Second) of Torts § 46 (1965)). To establish intentional infliction of emotional distress, however, the plaintiff must show that (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's actions caused the plaintiff emotional distress, and (4) the emotional distress suffered by the plaintiff was severe. *Id.* The second of these elements is at issue here:

> Conduct is outrageous, for purposes of an intentional infliction of emotional distress claim, if it surpasses all bounds of decency, such that it is utterly intolerable in a civilized community.... Liability does not extend to mere insults, indignities, threats, annoyances, or petty oppressions.

sion or misunderstanding as to the source, sponsorship, approval, or certification of goods and services; (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which be does not; (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (8) disparaging the goods, services, or business of another by false or misleading representation of facts; (11) making false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions; and (23) the failure to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into

which the consumer would not have entered had the information been disclosed.

The provisions of § 17.50(a) cited by the plaintiffs prohibit (1) the use or employment by any person of a false, misleading, or deceptive act or practice that is specifically enumerated in a subdivision of Subsection (b) of Section 17.46; (2) breach of an express or implied warranty; and (3) any unconscionable action or course of action by any person.

The Court also notes that both § 7.46 and § 17.50 of the DTPA were amended by the Texas Legislature in 1995. According to the legislative history, however, these amended provisions did not take effect until September 1, 1995. *See* Acts 1995, 74th Leg., ch. 414, §§ 3,5, ch. 463 § 1, effective September 1, 1995. Since the contract between Arneses and SEDCI was negotiated and signed in June of 1993, the amended provisions do not apply.

*Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 195 (5th Cir.1996) (citing *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir.1993) (internal quotation marks omitted)).

In this case, the plaintiffs have failed to raise an issue of material fact as to whether the defendants' conduct was extreme and outrageous. The plaintiffs argue, without any explanation or reference to the summary judgment record, that "the fraudulent scheme conducted by Alcoa, Arneses and Wacaser upon Luis Perez at the inception of the agreement in May of 1993 continuing through December of 1993, is itself outrageous and extreme conduct giving rise to the tort." Giving the plaintiffs every benefit of the doubt, such conduct may have been hurtful and perhaps even offensive, but intentional infliction of emotional distress requires far more: there must be evidence of conduct beyond "mere insults, indignities, threats, annoyances, or petty oppressions." *Ugalde*, 990 F.2d at 243. The plaintiffs have failed to present such evidence. The defendants are therefore entitled to summary judgment on this claim.

### Promissory Estoppel

According to the plaintiffs' third amended complaint, they invoked "the doctrine of promissory estoppel for the representations and inducements of Wacaser in his individual and representative capacity for Alcoa/Arneses." Although promissory estoppel is ordinarily available as a cause of action to someone who reasonably relies to his detriment on an otherwise unenforceable promise, *Wheeler v. White*, 398 S.W.2d 93, 96–97 (Tex. 1965),[11] Texas courts have held that a party cannot argue promissory estoppel in order to avoid compliance with the parol evidence rule. *State Nat'l Bank v. Academia, Inc.*, 802 S.W.2d 282, 293 n. 1 (Tex.App.—Corpus Christi 1990, writ denied); *Stavert Properties, Inc. v. RepublicBank of Northern Hills*, 696 S.W.2d 278, 282 (Tex.App.—San Antonio

1985, writ ref'd n.r.e.); *Joseph v. Mahoney Corp.*, 367 S.W.2d 213, 215 (Tex.Civ.App.— Austin 1963, writ ref'd n.r.e.); *see also Conway v. Saudi Arabian Oil Co.*, 867 F.Supp. 539, 543 (S.D.Tex.1994). Furthermore, it is well-settled that promissory estoppel is not available where there is a legally valid contract between the parties. *Jhaver v. Zapata Off–Shore Co.*, 903 F.2d 381, 385 n. 11 (5th Cir.1990). Because the Court has already held the plaintiffs' breach of contract claim is barred by the parol evidence rule, and the plaintiffs' promissory estoppel claim seeks the same recovery, the promissory estoppel claim must also be dismissed.

### Quantum Meruit

Neither the plaintiffs' pleadings nor their motion for summary judgment are entirely clear as to the basis for the quantum meruit claim. The plaintiffs third original petition states that "[p]laintiffs, additionally, and in the alternative, bring this suit in quantum meruit." The plaintiffs' response to the defendants' motion for summary judgment claims, without reference to case law or the summary judgment record, that "Alcoa and Arneses would be unjustly enriched by having the services of SEDCI from July to December of 1993 without the subsidy program." The plaintiffs add that "[i]f, however, this Court finds that no contract or fraud principles apply, then quantum merit [sic] should apply under quasi[-]contract principals [sic], at least through December of 1993."

Under Texas law, however, quantum meruit is available as an equitable remedy only when there is no express contract covering the services or materials furnished. *See Jhaver*, 903 F.2d at 384–85; *Infra–Pak Inc., v. Carlson Stapler & Shippers Supply, Inc.*, 803 F.2d 862, 864 (5th Cir.1986); *Truly v. Austin*, 744 S.W.2d 934, 937 (Tex.1988); *Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80, 86 (Tex.1976); *Economy*

---

**11.** Under Texas law, the basic requirements of a promissory estoppel claim are: (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment. *Clardy Mfg.*, 88 F.3d at 360; *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983). Texas courts have also established a

fourth and separate requirement of a "definite finding that injustice can be avoided only by the enforcement of the promise." *City of Beaumont v. Excavators & Constructors, Inc.*, 870 S.W.2d 123, 137 (Tex.App.—Beaumont 1993, writ denied).

*Forms Corp. v. Williams Brothers Constr. Co., Inc.,* 754 S.W.2d 451, 458 (Tex.App.—Hous.1988, no writ). In the present case, there was an express contract covering the plaintiffs' services to Arneses until December of 1993, when the defendants terminated the agreement. Although the employee subsidy was not part of this agreement, the subsidy was paid by Arneses to its employees, not by the plaintiffs. Quantum meruit is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted. *Vortt Exploration Co. v. Chevron U.S.A., Inc.,* 787 S.W.2d 942, 944 (Tex.1990). Recovery is permitted only when nonpayment for the services rendered would result in an unjust enrichment to the party benefitted by the work. *Id.*[12] The plaintiffs have failed to show they provided services or materials for which they were not compensated. Therefore, plaintiffs may not recover from the defendants for quantum meruit, and the defendants are entitled to summary judgment on this claim.

### Economic Duress

■■ The plaintiffs' final claim is for economic duress. They argue, again without reference to the summary judgment record, that economic duress applies "both as a defensive theory as to the $30,000.00 contract or advance and offensively as a cause of action. . . ." In either event, however, to avoid summary judgment on this claim the plaintiffs must raise a genuine issue of material fact as to each of the following elements: (1) a threat to do something which a party threatening has no legal right to do; (2) some illegal exaction or some fraud or deception; (3) imminent restraint such as to destroy free agency without the present means of protection; and (4) the claimant's financial distress was caused by the party accused of duress. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.1995); *King v. Bishop,* 879 S.W.2d 222, 223–24 (Tex.App.—Houston [14th Dist.] 1994, no writ); *Simpson v. MBank Dallas,*

*N.A.,* 724 S.W.2d 102 (Tex.App.—Dallas 1987, writ ref'd n.r.e.). "Elements one and two are very similar: the plaintiff must establish that the defendant threatened to do something he had no legal right to do, and that threat involved an illegal exaction or a fraudulent deception." *McCallum Highlands,* 66 F.3d at 92. In this case, however, the plaintiffs have presented no summary judgment evidence showing the defendants threatened to do something which they had no legal right to do. The defendants, therefore, are entitled to summary judgment on this issue.

### The Defendants' Counterclaims

■ The only remaining claims in this case are the defendants' counterclaims for money lent (count II) and breach of contract (count I). Beginning with the food service contract, the Court notes that for Arneses to succeed on its breach of contract claim it must establish the existence of a contract, performance by the plaintiff, breach by the defendant, and damages as a result of the breach. *Falk v. Axiam, Inc.,* 944 F.Supp. 542, 547 (S.D.Tex.1996); *Stegman v. Chavers,* 704 S.W.2d 793, 795 (Tex.App.—Dallas 1985, no writ); *Landrum v. Devenport,* 616 S.W.2d 359, 361 (Tex.Civ.App.—Texarkana 1981, no writ). Unfortunately, however, the defendants offer no argument or evidence regarding the proper measure of damages for their breach of contract counterclaim, and the plaintiffs' response contains only the following cursory statement: "With regard to Arneses['] claims of breach of contract from the written agreement of June 24, 1993, there is no evidence supporting a judgment as a matter of law that Arneses is entitled to summary judgment on these counterclaims." The defendants' motion for summary judgment notes that "Arneses wishes to reserve the calculation of damages that it suffered as a result of SEDCI's breach." The defendants' proposed order would enter judgment against the plaintiffs as to their breach of contract counterclaim, "in an amount to be

---

**12.** Quantum meruit involves four elements: (1) valuable services were rendered; (2) for the person sought to be charged; (3) the services were accepted, used, and enjoyed by the person sought to be charged; and (4) the acceptance, use, and

enjoyment was under such circumstances as reasonably notified the person sought to be charged that the claimant, in performing such services, was expecting to be paid by the person sought to be charged. *Vortt,* 787 S.W.2d at 944.

agreed by the parties within ten business days of this Order, or determined by further proceedings thereafter if no such agreement is reached." The Court declines this request, and instead will deny the defendants' motion for summary judgment as to count I of their counterclaims without prejudice to refile as a new cause of action.

█ As for the defendants' second counterclaim, the loan agreement, as noted previously, contains a choice-of-law provision which provides the agreement will be supplemented by the laws of the State of Coahuila, Mexico. The plaintiffs maintain· it is not clear whether Mexican law will be used to interpret the agreement, or that it will be supplemented by Mexican law. The Court concludes that application of Mexican law to the loan agreement is a reasonable interpretation of the parties' intent, given the choice-of-law provision, the language of the contract, and the other summary judgment evidence in this case. But even if the Court were to apply Texas law as the plaintiffs claim it should, the result would here be the same—defendants would still be entitled to summary judgment for the $30,000 undisputedly loaned to and not repaid by plaintiffs.

█ Beginning with Texas law, the Court notes that the summary judgment evidence shows Arneses loaned SEDCI $30,000 pursuant to a written loan contract, that the plaintiffs were to repay the debt on or before April 1, 1994, that Arneses demanded the plaintiffs repay the debt by a letter dated September 1, 1995, and that the plaintiffs have not repaid the debt. This is sufficient to establish a successful breach of contract claim under Texas law. *See, e.g., Falk,* 944 F.Supp. at 547; *Stegman,* 704 S.W.2d at 795; *Landrum,* 616 S.W.2d at 361. In response the plaintiffs again offer economic duress, which they now claim as a defense to the loan agreement. As before, however, they do not argue the point with specificity nor do they refer the Court to any summary judgment evidence which would support the assertion.[13] The Court has already discussed this issue once, and it need not do so again.

As for Mexican law, the plaintiffs do not attempt to rebut the defendants' detailed discussion of Mexican law or their supporting declaration from David Lopez, an associate professor of law with the St. Mary's University School of Law and a recognized authority on the laws of Mexico.[14] Furthermore, the plaintiffs' response to the defendants' motion for summary judgment states that "[r]elative to the $30,000 advance or note executed by Plaintiffs, Plaintiffs have no defenses under Mexican law for the note." Given this concession and the summary judgment evidence, the Court therefore concludes the defendants have established all of the elements of a breach of contract claim for the $30,000 note, under both Texas and Mexican law. Accordingly, the Court will enter summary judgment against the plaintiffs and in favor of defendants on Count II of their counterclaims, for money lent.

### Conclusion and Order

In summary, there is no genuinely disputed issue of material fact that:

**13.** The plaintiffs' response claims they have "alleged the defense of economic duress of the note and have alleged facts and supporting evidence to prove the same." Unfortunately, however, they do not indicate where this supporting evidence may be found in the summary judgment record. The two cases they cite, *Deer Creek, Ltd. v. North Am. Mortgage,* 792 S.W.2d 198 (Tex. App.—Dallas 1990, no writ); *Herndon v. First Nat'l Bank of Tulia,* 802 S.W.2d 396 (Tex.App.—Amarillo 1991, writ denied), are not analogous to the situation in the present case, and therefore, do not resolve the issue.

**14.** Professor Lopez's declaration attests that Articles 358 to 370 of the Mexican Commercial Code govern mercantile loans such as the SEDCI/Perez–Arneses loan agreement. Article 358 provides that "[a] loan transaction shall be deemed mercantile if it is identified as one wherein the borrowed and loaned effects shall be dedicated only for commercial purposes. If entered into between merchants they shall be presumed to be mercantile." *See* MEXICAN CIVIL AND COMMERCIAL CODES 772–73 (West 1995, translated by Abraham Eckstein & Enrique Zepeda). Under Article 359, the debtor in a mercantile loan is liable for repayment of the loan in an amount "pursuant to the monetary law in effect in the Republic at the time of payment, and this shall be a non-waivable restriction." *Id.* Moreover, if the parties to the loan did not agree on an interest rate, the debtor is liable for interest at the rate of 6 percent per annum, "from the day following the due date." *Id.*

(1) The quality of food provided by plaintiffs was, to be charitable, less than palatable. Indeed, the Arneses workers might use the Spanish word "dañino" (noxious).

(2) Defendants exercised the option under paragraph 10 of the contract to terminate the contract.

(3) Assuming for the sake of argument there was an explicit or implicit promise to continue the employee meal subsidy, such alleged promise, as between plaintiffs and defendants, would be unenforceable for the reasons stated in this opinion.

(4) Defendants loaned plaintiffs $30,000 and plaintiffs have not repaid the money.

Accordingly, IT IS HEREBY ORDERED that:

(1) The defendants' motion for the application of Mexican law (Document Number 86–1) is DENIED.

(2) The defendants' motion for summary judgment under Texas law (Document Number 87–3) is GRANTED, EXCEPT AS TO COUNT I OF THEIR COUNTERCLAIMS, for breach of contract, which is DENIED AND DISMISSED WITHOUT PREJUDICE TO REFILE AS A SEPARATE CAUSE OF ACTION.

(3) All other motions are DENIED AS MOOT.